# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

JACQUELINE Y. CRONK,

      Plaintiff,

vs.

COMMISSIONER OF SOCIAL
SECURITY, agent of Michael
J. Astrue,

      Defendant.

‖    **No. 10-CV-3026-DEO**

‖    **MEMORANDUM OPINION AND ORDER**

———————————————

## I. INTRODUCTION AND BACKGROUND

Plaintiff, Jacqueline Y. Cronk (hereinafter "Cronk"), seeks disability insurance benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401 et seq., and supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. Tr. 147-49, 606-08. Cronk seeks review of the Commissioner's decision that she is not disabled under the Act. This Court has authority to review a final decision by the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). As the Court will set out herein, the Court will reverse the ALJ's decision as to Cronk's mental impairments and will direct the Commissioner to award

supplemental security income benefits to Cronk.[1]

Cronk was born in 1961 and alleges that she was disabled beginning on April 5, 2002, due to bilateral carpal tunnel syndrome, tendinitis, rotator cuff problems, back and neck pain, migraine headaches, heat exhaustion, and depression. Tr. 181. According to the ALJ, Cronk's earnings record shows that she remained insured through March 31, 2003. Tr. 23.

## A.   Medical Treatment Records

The record reflects that Cronk received mental health treatment beginning in 2000 at Lutheran Social Services. Tr. 245-46. Mary Boone, Licensed Independent Social Worker ("LISW"), noted in June 2001 that Cronk was referred for counseling by the Workforce Center because of her depression. Ms. Boone stated at the time she was referred, Cronk "was under a lot of stress financially due to her limitations and lack of employment. At that time she was feeling helpless and in despair." Tr. 245.

_____

[1] Because the Court is concluding Cronk is completely disabled based on her mental impairments, the Court need not review the ALJ's decision as to her physical impairments. Nevertheless, the Court is persuaded that, while Cronk suffers physical problems and pain, she has not demonstrated that she was disabled based on her physical impairments alone.

The record further reveals that Cronk took Prozac for her depression in 2000 and 2001, although there is little discussion of her depression. Tr. 247, 249, 250. She sought treatment at the Albert Lea Medical Center in 2001 and 2002, and noted in 2002 she was doing better on Prozac. Tr. 273, 281-83.

On August 27, 2002, Disability Determination Services referred Cronk to Steven Mayhew, Psychologist, for a consultative psychological disability examination. Tr. 286-87. Dr. Mayhew diagnosed Cronk with depressive disorder not otherwise specified, mixed personality features, and psychosocial stressors - vocational/occupational and financial/economic. He assessed Cronk a Global Access of Functioning ("GAF") score of 51-60, with moderate social, occupational, or school functioning. Tr. 287. Dr. Mayhew's summary and recommendations stated the following:

> [Cronk's] capacity to understand, retain, and follow work-related instructions and procedures is considered moderately impaired and would likely require ongoing monitoring or supervision. Sustained attention, concentration, and reasonable pace at entry-level work-like tasks is estimated to be moderately limited at this time. Monitoring by work supervisors would likely be necessary. Her capacity to

> interact appropriately with supervisors, co-workers, and the general public is considered moderate to markedly impaired. Difficulties working in close proximity to others is anticipated at this point. Jackie's capacity to tolerate stress and pressure of simple, unskilled work, and to respond appropriately is estimated to be moderately limited. Poor social judgment or decision-making suggested. . . .

Tr. 287.

Cronk began seeking mental health treatment at the Mental Health Center of North Iowa in July 2003. Tr. 328. In the July 16, 2003, clinical assessment, James Cline, LISW, noted that Cronk complained of depression and anxiety, increased isolation, increased withdrawal, and that it had been going on for years. Tr. 328. Cronk indicated she cried a lot and that her anxiety was high. Tr. 328. Cronk also reported that when her medical pain flared up, her depression and anxiety worsened. Mr. Cline noted that anger was still a problem for Cronk. Tr. 328. Mr. Cline also noted that Cronk was a "mild, possibly moderate, suicide risk depending upon the situation." Tr. 328. Mr. Cline diagnosed Cronk, in part, with depression not otherwise specified and assessed her a GAF score of 55. Tr. 329.

Cronk's treating psychiatrist at Mental Health Center of North Iowa, Dr. Mark Lassise, examined Cronk on July 23, 2003. Tr. 334-35. Cronk reported she had been depressed all her life. Tr. 334. Dr. Lassise noted Cronk's affect was bland to depressed. Her thought content was dependent, her mood was low, and her insight was poor. Tr. 334. Dr. Lassise diagnosed Cronk with major depression - recurrent, dependent personality features, and chronic depressive difficulties. He assessed her a GAF score of 45. Tr. 334.

Cronk continued treatment with Mr. Cline and Dr. Lassise for nearly four years. These treatment notes span nearly 200 pages in the administrative record. In his sessions with Cronk, Mr. Cline generally described Cronk as depressed and angry. Tr. 396-513, 531-83. Mr. Cline assessed Cronk with a variety of GAF scores usually ranging from 45-60 (Tr. 507, 513), the majority of which were between 45-55. See, e.g., Tr. 399, 401, 403, 404, 405, 409, 430-32, 484, 486, 532, 533.

Dr. Lassise examined Cronk approximately every three months. He mostly prescribed Cronk Lexapro and Wellbutrin for her depression, noting at times that she was doing well on her medications. Tr. 454, 464, 475. He nevertheless assessed her

GAF scores of 45, 47, 50, and 51.  <u>See</u>, e.g., Tr. 442, 454, 464, 475, 485, 495, 509.

Mr. Cline and Dr. Lassise also wrote a series of letters regarding Cronk's condition.  On May 21, 2004, Mr. Cline and Dr. Lassise wrote a letter to Cronk's attorney and stated they were treating Cronk for recurrent depression with medication and psychotherapy.  Tr. 352.  Mr. Cline and Dr. Lassise noted Cronk's physical limitations, which prevented her from working certain jobs.  They also stated, "[s]he is easy to anger and when she is experiencing these painful episodes, conflicts with supervisors or co-workers often arise that cause her to either quit or somehow lose her job."  Tr. 352.  They continued, "[w]hat occurs is that [Cronk] oftentimes misses a lot of work, has significant conflicts with peers and supervisors and impulsively makes decisions that end up having her lost her job."  Tr. 352.  Mr. Cline and Dr. Lassise concluded, "[i]t is our opinion at this time that her symptoms continue to exacerbate not allowing her to work daily in a competitive work environment.  Prognosis is guarded at this time."  Tr. 352.

On January 16, 2006, Mr. Cline and Dr. Lassise wrote another letter to Cronk's attorney regarding Cronk's mental status. They stated that Cronk's diagnosis was major depression. Tr. 360. They further noted that Dr. Lassise's GAF assessment was 49 as of September 2005, and Mr. Cline's GAF assessment was 50 as of December 21, 2005. They noted Cronk continued to complain of pain and fatigue due to medical problems, which she indicated prevented her from working. Tr. 360. Because she could not find full-time work, Mr. Cline and Dr. Lassise noted Cronk had become very discouraged, depressed, and remained quite anxious. Tr. 360. They opined her "medical condition and the possibility of finding work that would suit her . . . has not been available[;] therefore, [Cronk] would have a very difficult time maintaining regular attendance. Because of that situation she would not be able to work everyday in a competitive work environment." Tr. 360.

On March 6, 2006, Mr. Cline wrote a letter to Cronk's attorney regarding Dr. Mayhew's psychological evaluation in his summary statement. Mr. Cline stated he concurred with Dr. Mayhew's summary. He opined Cronk "would be moderately limited and moderately impaired with sustaining attention,

with interacting appropriately with others in a business setting and would have moderate impairment in tolerating stress at work." Tr. 396.

On May 11, 2007, Mr. Cline wrote a letter to Cronk's attorney regarding her depression. He noted that the Mental Health Center had treated Cronk since 2003. He stated that Cronk had difficulty in regulating her emotions. He stated, "[Cronk] can become extremely depressed and upset and this has a limiting influence on her decision making, organizing and planning. She has trouble in dealing with even minor frustrations." Tr. 515. As a result, Mr. Cline opined that "her current capabilities would significantly negatively impact her ability to maintain sound work habits." Tr. 515. Mr. Cline concluded that Cronk's diagnosis was major depression – recurrent, and her prognosis was guarded. Tr. 515. He further acknowledged that Cronk's global functioning had basically remained the same since she started treatment in 2003. Tr. 516.

**B.    The ALJ Hearing**

**1.    Cronk's Testimony**

At the ALJ hearing on May 29, 2007, Cronk testified she

suffered from severe depression, which caused her to be "very close to tears all the time." Tr. 648. Cronk stated she had a problem getting along with people, including supervisors. Tr. 648. She testified that she would get argumentative, and as a result, had walked out on jobs in the past. Tr. 648. She also stated that she yelled at her family every day. Cronk confirmed that she had been suicidal in the past although she was never civilly committed. Tr. 649-50.

Cronk testified that she had difficulty remembering and following directions. She also had difficulty concentrating. Tr. 650-51. She was not involved in any groups, organizations, churches, etc. Tr. 653. Cronk considered herself a "loner," and testified that if things did not go her way, she would get upset and mad. Tr. 653. When she was frustrated, she started "yelling and screaming" and "freaking out." Tr. 653.

### 2. Vocational Expert's Testimony

At the ALJ hearing on May 29, 2007, in response to a hypothetical similar to the ALJ's residual functional capacity finding in this case, the VE testified that the individual would be unable to perform past relevant work. Tr. 657. The

VE testified, however, that the hypothetical individual could perform other jobs in the national economy, including surveillance monitor, photo process worker, and sorter/cutter/paster in the publishing industry. Tr. 658.

Cronk's attorney examined the VE and asked whether an individual who also required ongoing monitoring and supervision of her work would affect the VE's answer. The VE testified that in unskilled work, supervision was fairly constant. Tr. 659-60. He stated, "[y]ou won't find an unskilled position without supervisory responsibility over their shoulder." Tr. 660. Cronk's attorney then asked whether an individual who had a very difficult time getting along with supervisors could handle the jobs cited by the VE. The VE answered, "if a person can not get along with the supervisors in performing their normal assigned tasks, then competitive employment especially in unskilled work as well as a wide range of semi-skilled and skilled jobs could not be performed on any kind of a sustained basis." Tr. 660. The VE further testified that an individual who was rarely able to make independent judgment would be incapable of competitive employment. Tr. 661-62.

## C.  The ALJ's Decision

The ALJ uses a five-step sequential analysis to determine whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920.  A claimant must prove:  (1) that he has not engaged in substantial gainful activity; (2) that he has a medically determinable severe impairment, as that term is defined in the regulations; and *either* (3) that his impairment meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is presumed to be disabled, and no further analysis is needed); *or* (4) that his impairment prevents him from performing his past relevant work.  20 C.F.R. § 404.1520.  If the claimant carries his burden to this point, then the burden shifts to the Commissioner to prove there are other jobs the claimant can perform.  <u>Gonzales v. Barnhart</u>, 465 F.3d 890, 894 (8th Cir. 2006); <u>Johnson v. Barnhart</u>, 390 F.3d 1067, 1070 (8th Cir. 2004).

In this case, the ALJ determined at step one that Cronk had not engaged in substantial gainful activity since April 5, 2002, Cronk's alleged onset date.  Tr. 23.  At step two, the ALJ determined that Cronk had the following severe impairment: depressive disorder not otherwise specified.  Tr. 23.

At step three, the ALJ found that Cronk did not have an impairment or combination of impairments that met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 24. The ALJ determined Cronk had mild limitation in the area of activities of daily living, moderate limitation in the area of social functioning, moderate limitation in concentration, persistence, or pace, and had experienced no episodes of decompensation. Tr. 24.

The ALJ assessed Cronk with the following residual functional capacity:

> to perform the exertional and nonexertional work-related activities of light work, except that she can lift and carry no more than 20 pounds occasionally and no more than 10 pounds frequently. She can stand 30 minutes at a time for 2 hours total in an 8-hour workday, and sit 60 minutes at a time for 6 hours total in an 8-hour workday. She can occasionally climb stairs and ladders, balance, stoop, kneel, crouch, and crawl; and she can occasionally reach overhead with the bilateral upper extremities. She is limited to performing simple, routine tasks with occasional changes in the routine work setting. She can occasionally interact with co-workers and the general public.

Tr. 25.

In arriving at this conclusion, the ALJ found that Cronk's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [Cronk's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." Tr. 26. The ALJ determined Cronk was "somewhat non-compliant" with her depression medication and was reluctant to make alternative attempts for treatment. Tr. 26. The ALJ also noted that Cronk was never admitted for in-patient psychiatric treatment, and she experienced significant relief with medication. Tr. 26.

The ALJ also gave "controlling weight" to the opinions of the state agency, citing to the agency's September 6, 2002, mental functional capacity assessment. Tr. 27. The ALJ noted the state agency opined that Cronk's mental impairment created some moderate limitations of function, but the limitations did not meet or equal a listing level. The agency found that Cronk was "not significantly limited in her understanding and memory, sustained concentration and pace, social interaction or adaptation." Tr. 27. The ALJ also noted that Cronk was "capable of sustaining sufficient concentration and attention

to perform noncomplex, repetitive and routine cognitive activity without severe limitations." Tr. 27.

The ALJ, however, gave "less weight" to the opinions of Cronk's counselor, James Cline. Tr. 27. The ALJ cited to Mr. Cline's March 2006 letter stating he agreed with Dr. Mayhew's consultative examination findings. With respect to this letter, the ALJ stated, "Mr. Cline had more than a one time encounter with the claimant and did not specify his reason for agreeing with the consultative examiner's assessments." Tr. 27.

After making his residual functional capacity finding, the ALJ determined at step four that Cronk was unable to perform her past relevant work as a gluer, production assembler, and general laborer. Tr. 27. At step five, the ALJ determined there were jobs that existed in significant numbers in the national economy that Cronk could perform as described by the VE during the course of the VE's testimony. These unskilled jobs included surveillance monitor, photo process worker, and sorter/cutter/paster in publishing. Tr. 28. Thus, the ALJ determined that Cronk was not disabled from

April 5, 2002, through the date of the ALJ's decision.  Tr.
28.

   After the ALJ issued his decision on January 3, 2008, the
Appeals Council denied Cronk's request for review on March 19,
2010.  Tr. 8-10.  Cronk subsequently filed the instant action.
This Court heard oral arguments and is now prepared to rule on
the matter.

## II.  LAW AND ANALYSIS

   In reviewing this case, this Court is required to
determine whether the ALJ's findings are supported by
substantial evidence on the record as a whole.  See 42 U.S.C.
§ 405(g); Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir.
2002).  Substantial evidence is less than a preponderance of
the evidence, but it is enough that a reasonable mind would
find it adequate to support the ALJ's decision.  See Johnson
v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  As long as
there is substantial evidence in the record that supports the
ALJ's decision, the Court may not reverse it simply because
substantial evidence exists in the record that would have
supported a contrary outcome or because the Court would have
decided the case differently.  See Haley v. Massanari, 258

F.3d 742, 747 (8th Cir. 2001).  If, after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000). Still, in reviewing the record this Court must remain mindful of the ALJ's "duty to develop the record fully and fairly" in the non-adversarial administrative proceeding.  Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

In this case, the ALJ's decision as to Cronk's mental impairments is not supported by substantial evidence on the record as a whole.  The ALJ erred by giving "controlling weight" to the opinions of the state agency consultants and "less weight" to the opinions of Mr. Cline.  Additionally, the ALJ erred by not explaining what, if any, weight he gave to Cronk's treating psychiatrist, Dr. Lassise.  Finally, the ALJ's residual functional capacity findings as to Cronk's mental limitations are not supported by substantial evidence; thus, the ALJ's conclusion at step five that jobs existed in

the national economy that Cronk could perform is not supported
by substantial evidence on the record as a whole.

First, the ALJ's reasons for giving "less weight" to the
opinions of Mr. Cline were not supported by substantial
evidence. Additionally, the ALJ erred by not explaining what,
if any, weight he gave to Cronk's treating psychiatrist, Dr.
Lassise.

> A treating physician's opinion should not
> ordinarily be disregarded and is entitled
> to substantial weight. See Ghant v. Bowen,
> 930 F.2d 633, 639 (8th Cir. 1991). In
> fact, it should be granted controlling
> weight if it is well-supported by medically
> acceptable clinical and laboratory
> diagnostic techniques and is not
> inconsistent with the other substantial
> evidence in the record. See Kelley v.
> Callahan, 133 F.3d 583, 589 (8th Cir.
> 1998).

Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000); see
also Social Security Rule ("SSR") 96-2P. The ALJ's reasons
for giving "less" weight to Mr. Cline's opinions are
troubling. As mentioned, the ALJ cited to Mr. Cline's March
2006 letter stating he agreed with Dr. Mayhew's consultative
examination findings, which opined that Cronk had moderate
impairments, an inability to follow work related directions,
and required monitoring and an additional psychiatric

17

consultative examination. Tr. 27. The ALJ, however, stated that "Mr. Cline had more than a one time encounter with the claimant and did not specify his reason for agreeing with the consultative examiner's assessments." Tr. 27. Mr. Cline evaluated Cronk more than any other examining or medical source in the administrative record. He was more familiar with Cronk's depression and mental impairments than any other person. One need only review the extensive record, which includes the other letters sent to Cronk's attorney, to determine Mr. Cline's conclusions with respect to Cronk's impairments and limitations.

Indeed, the ALJ erred by not giving Mr. Cline's and Dr. Lassise's opinions substantial, if not controlling, weight. While Mr. Cline may not be an "acceptable medical source" under 20 C.F.R. § 404.1513(a), his opinion constitutes an "other" medical source under § 404.1513(d)(1). See also Shontos v. Barnhart, 328 F.3d 418, 425-26 (8th Cir. 2003). As the Eighth Circuit has explained, therapists such as Mr. Cline are "appropriate sources of evidence regarding the severity of a claimant's impairment, and the effect of the impairment on a claimant's ability to work." Shontos, 328 F.3d at 426. In

<u>Shontos</u>, the Eighth Circuit appeared to afford great weight to the claimant's therapists even though they were not "acceptable medical sources." The court reasoned that the claimant was treated at a mental health center under a team approach, and that the opinions of the therapists who had a long-standing relationship with the claimant were consistent with the opinions of the treating psychologist. <u>Id.</u>

In this case, Mr. Cline and Dr. Lassise certainly took a "team approach" to Cronk's treatments. Both Mr. Cline and Dr. Lassise treated Cronk for a substantial period of time, and their opinions were consistent. Mr. Cline and Dr. Lassise had access to each other's treatment notes, and they co-wrote numerous letters to Cronk's attorney. The treatment notes and letters reveal they were in agreement as to Cronk's impairments and limitations. Thus, the ALJ erred by not giving their opinions substantial, if not controlling, weight.

Next, the ALJ erred by giving "controlling" weight to the opinions of the state agency consultant, who never examined Cronk. "[T]he opinions of nonexamining sources are generally . . . given less weight than those of examining sources." <u>Willcockson v. Astrue</u>, 540 F.3d 878, 880 (8th Cir. 2008); <u>see</u>

20 C.F.R. § 404.1527(d)(1). "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole. <u>Shontos</u>, 328 F.3d at 427. The regulations also provide that, when evaluating a nonexamining source's opinion, the ALJ "evaluate[s] the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources." 20 C.F.R. § 404.1527(d)(3).

In this case, the state agency consultant conducted his nonexamining evaluation of Cronk in 2002, when the record was without the majority of Cronk's mental health treatment records that existed when the ALJ issued his January 3, 2008, decision under review by this Court. Cronk did not begin substantial mental health treatment until 2003. The Court finds it significant that the state agency consultant was without this evidence, as he had virtually no mental health treatment records on which to base his conclusions. This is especially troublesome because the consultant did not examine Cronk. Thus, the Court is persuaded the ALJ erred not only because he gave a nonexamining physician's opinion

"controlling" weight when the record before the ALJ contained mental health treatment records spanning nearly four years, but also because the record was simply insufficient in 2002 to reasonably give the state agency consultant's opinion even little, if any, weight at all.

Because the ALJ erred by not giving Mr. Cline's and Dr. Lassise's opinions substantial, if not controlling, weight, the hypothetical posed to the VE was not supported by substantial evidence. A VE's testimony constitutes substantial evidence only when it is based on a properly phrased hypothetical question which encompasses all of the claimant's impairments. <u>Pickney v. Chater</u>, 96 F.3d 294, 296 (8th Cir. 1996). At the ALJ hearing, Cronk's attorney asked the VE a number of questions relating to Mr. Cline's and Dr. Lassise's findings. One of these questions was whether an individual who had a very difficult time getting along with supervisors could handle the jobs cited by the VE. The VE answered, "if a person can not get along with the supervisors in performing their normal assigned tasks, then competitive employment especially in unskilled work as well as a wide

range of semi-skilled and skilled jobs could not be performed on any kind of a sustained basis." Tr. 660.

The record is replete with references to Cronk's anger problems and inability to get along with others, including members of her own family. As previously discussed, both Mr. Cline and Dr. Lassise stated on May 21, 2004, that Cronk was "easy to anger," and when she experienced painful episodes, "conflicts with supervisors or co-workers often arise that cause her to either quit or somehow lose her job." Tr. 352. Mr. Cline noted on May 11, 2007, that Cronk had difficulty in regulating her emotions. He stated, "[Cronk] can become extremely depressed and upset and this has a limiting influence on her decision making, organizing and planning. She has trouble in dealing with even minor frustrations." Tr. 515. As a result, Mr. Cline opined that "her current capabilities would significantly negatively impact her ability to maintain sound work habits." Tr. 515. These opinions are amply supported in the treatment notes, as one of her primary problems revolved around her severe anger and aggressive nature. See, e.g., Tr. 333, 456, 461, 465, 481, 482, 484, 486, 492, 508.

Thus, the Court is persuaded the ALJ's residual functional capacity finding that Cronk could "occasionally interact with co-workers and the general public" was not supported by substantial evidence on the record as a whole. Substantial evidence reveals that Cronk's anger problems combined with her severe depression would prevent her from getting along with co-workers and her supervisor. Thus, according to the VE, she would not be employable.

Even assuming the average employer in the national economy would hire Cronk, the Court is persuaded she would suffer the same disabling limitations and would not be able to keep a job for any significant period of time. To determine at step five whether a claimant can perform other jobs in the national economy, the Secretary must consider whether the claimant can actually find and hold a job in the real world. Parsons v. Heckler, 739 F.2d 1334, 1340 (8th Cir. 1984). This Court is persuaded that no reasonable employer in the national economy would tolerate Cronk for any significant period of time. This is no doubt due to her disabling impairments. Thus, the record as a whole does not support any conclusion that Cronk is employable in the national economy. The record

as a whole overwhelmingly supports a finding of disability.

The ALJ also found that Cronk's statements concerning the intensity, persistence and limiting effects of her symptoms were "not entirely credible." Tr. 26. One reason the ALJ gave was that Cronk was "somewhat non-compliant" with her medication and attempts at dealing with her depression. Tr. 26. The Court agrees that, at times, Cronk was not fully compliant with her medication. However, the record reveals that when Cronk was compliant and her depression was "controlled," she still experienced disabling limitations. Dr. Lassise found her GAF score during these times to be 45-47. Tr. 495, 509. Cronk also exhibited anger and aggressive behavior when compliant with medication. Tr. 481, 484, 486, 492, 508. Thus, even when compliant with medication, the Court is persuaded Cronk was disabled and unable to work full-time.

The final remaining issue is whether Cronk is entitled to both disability insurance benefits under Title II of the Act and supplemental security income benefits under Title XVI of the Act. As mentioned, Cronk's date last insured was March 31, 2003. Tr. 23. To qualify for disability insurance

benefits under Title II of the Act, Cronk must establish disability by March 31, 2003. The Court is persuaded she has not done so. The administrative record is quite limited prior to this date as it pertains to Cronk's mental impairments, and the Court is further persuaded that, while she experienced physical problems and pain, she has not established disability based on her physical impairments. The Court, however, is persuaded substantial evidence on the record as a whole overwhelmingly supports a finding that Cronk was disabled based on her mental impairments after she sought treatment with Mr. Cline and Dr. Lassise. Thus, the Court will award her supplemental security income benefits under Title XVI of the Act with an onset date of January 16, 2006.

## III. CONCLUSION

For the reasons stated herein, the Court is persuaded that substantial evidence on the record does not support the ALJ's finding that Cronk is not disabled. Substantial evidence reveals that there are no jobs in the national economy she could perform given her mental impairments. The Court is further persuaded that there is no need to remand to the Commissioner to take additional evidence. The record

contains sufficient evidence to allow the Court to render this decision.

**IT IS THEREFORE HEREBY ORDERED**, pursuant to sentence four of 42 U.S.C. § 405(g), that the decision of the ALJ is **reversed**, and the Commissioner is directed to compute and award supplemental security income benefits under Title XVI of the Social Security Act to Cronk with an onset date of January 16, 2006.

A timely application for attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 ("EAJA"), must be filed within thirty (30) days of the entry of final judgment in this action. Thus, if this decision is not appealed, and Cronk's attorney wishes to apply for EAJA fees, he must do so within 30 days of the entry of the final judgment in this case.

**IT IS SO ORDERED** this 27th day of April, 2011.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa